In re John W. THYDEN, Respondent.

A Member of the Bar of the District of Columbia (Bar Registration No. 153908).

No. 02–BG–91.

District of Columbia Court of Appeals.

Argued Nov. 19, 2002.

Decided June 16, 2005.

Philip J. Hirschkop, Leesburg, VA, for respondent.

Ross T. Dicker, Assistant Bar Counsel, with whom Joyce E. Peters, Bar Counsel at the time the brief was filed, was on the brief, for the Office of Bar Counsel.

Before FARRELL, RUIZ and REID, Associate Judges.

RUIZ, Associate Judge:

This disciplinary case comes to the court on exception by respondent, John W. Thyden, a member of the District of Columbia Bar, to the Report and Recommendation of the Board on Professional Responsibility. The disciplinary charges stem from Thyden's representation of clients in bankruptcy proceedings in Virginia. Thyden is also a member of the Bar of the Commonwealth of Virginia, which, after investigation of charges based on the same representation, decided to dismiss the charges with terms requiring him to complete an ethics course in addition to the Virginia continuing legal education requirements. After conducting its own investigation and hearing, the District of Columbia Board on Professional Responsibility recommends that Thyden be suspended from practicing law in the District for thirty days. Thyden contends that the same disposition should obtain in this proceeding as in Virginia, and raises a number of challenges based on delay, the procedures followed by the Hearing Committee, and the evidentiary sufficiency of the findings. We see no merit in any of these claims and adopt the Board's recommendation.

## I.

### The Disciplinary Proceedings

The charges arose from respondent's representation of unsecured creditors between October 1990 and April 1992, in a proceeding in the United States Bankruptcy Court for the Eastern District of Virginia. A disciplinary matter was commenced by the Virginia State Bar in May, 1992. A complaint was also made to D.C. Bar Counsel in June of 1992, but, at respondent's request, the proceeding in the District of Columbia was deferred pending resolution of the charges in Virginia.

In March 1998, the Virginia State Bar issued its determination (through a Subcommittee of the Fifth District Committee), finding that respondent had violated provisions of Virginia Disciplinary Rule 6–101(c) and (d) (competence and promptness) for failing to maintain his client reasonably informed or conveying an offer of settlement, but agreeing to dismiss the charges, "with terms." The terms imposed were completion of six hours of continuing legal education in the area of ethics, in addition to the mandatory continuing legal education hours required to maintain a license to practice law in the Commonwealth of Virginia. If the terms were not satisfactorily met, respondent would receive a private reprimand.

Respondent notified D.C. Bar Counsel in June 1998, that the Virginia State Bar had dismissed its disciplinary proceedings, and asked that the D.C. proceeding be treated as a reciprocal discipline case and similarly dismissed. Bar Counsel disagreed and suggested that respondent file his request directly with the court, noting, however, that Bar Counsel would oppose the request. Instead, respondent directed his request to the Board, which notified respondent that it did not agree with the substance of his request because the Virginia dismissal was not "discipline" within the meaning of D.C. Bar Rule XI, § 11(c). Moreover, the Board considered that it did not have jurisdiction to make a recommendation to the court because the matter had not been referred to the Board by the court for its recommendation pursuant to Rule XI, § 11(d), and again invited respondent to file a copy of Virginia's order of dismissal and renew his request directly with the court. In the meantime, Bar Counsel had filed a specification of charges charging respondent with violations of the disciplinary rules of the Bar of the District of Columbia Court of Appeals based on respondent's dishonest assertion that he represented a party, without having obtained that party's consent; failure to communicate with his client and keep the client reasonably informed on the matters that were the subject of the representation; failure to inform his client of a settlement offer; and filing of numerous piecemeal and delayed pleadings in the bankruptcy action which seriously interfered with the administration of justice.[1]

A hearing was conducted on January 27, 1999.[2] Respondent filed copies of the Vir-

---

1. The violations charged involve the following provisions of the Code of Professional Responsibility for that portion of the conduct that occurred prior to January 1, 1991: Disciplinary Rule (DR) 1–102(A)(4) (conduct involving dishonesty, fraud, deceit, and misrepresentation); DR 1–102(A)(5) (conduct prejudicial to the administration of justice); and DR 7–102(A)(1) (taking action on behalf of a client when it is obvious that action is merely to harass or maliciously injure another). For that portion of the conduct that occurred after January 1, 1991, Bar Counsel charged violations of the following Rules of Professional Conduct: Rule 1.4(a) (failure to keep a client reasonably informed about the status of a matter); Rule 1.4(b) (failure to explain a matter to a client to the extent reasonably necessary to permit the client to make informed decision regarding the repre-

sentation); Rule 1.4(c) (failure to promptly inform a client of an offer of settlement); Rule 3.1 (bringing adversary action that is frivolous and without basis); Rule 8.4(c) (conduct involving dishonesty, fraud deceit or misrepresentation); and Rule 8.4(d) (conduct that seriously interferes with the administration of justice).

2. At the hearing, H. Jason Gold (counsel to a creditor in the bankruptcy proceeding) and Leo Joseph Scolforo (counsel to respondent's client), testified for Bar Counsel. Respondent testified on his own behalf. The parties stipulated to the admissibility of the transcript of the testimony of Dr. Richard P. Suter at a hearing on sanctions held before the Bankruptcy Court. The parties also stipulated to the testimony of James Gross (respondent's

ginia materials with this court on February 4, 1999, after the evidentiary hearing had concluded, and requested that the proceeding be treated as a reciprocal discipline. The court denied the request. *See In re Thyden,* No. 99–BG–143 (Order of Mar. 3, 1999). On April 13, 2001, the Hearing Committee issued its report, concluding that respondent violated D.C. Rules 1.4(a), (b) and (c) by failing to keep his client reasonably informed of the litigation generally and of an offer of settlement in particular, as well as Rule 8.4(d) by burdening the administration of justice, but that he did not violate Rule 8.4(c) (dishonest conduct) by falsely holding himself out as representing a client without consent. The Committee recommended a thirty-day suspension. Bar Counsel agreed with the Committee's findings, but respondent filed exceptions. The matter proceeded to the Board on Professional Responsibility, which concluded that the findings of fact in the Hearing Committee's report were supported by substantial evidence in the record and also recommended a thirty-day suspension.[3] The matter is before the court on respondent's exception to the Board's findings and recommendation.

In reaching its conclusions, the Board relied on the following findings of fact: On April 27, 1987, Dr. Richard P. Suter, through his professional corporation ("Suter PC"), paid $9,000 to Case Limited Partnership, at that time owner of the Warrenton–Fauquier Airport in Fauquier County, Virginia, for an airplane hangar to be built for his use. On March 31, 1988, Case Limited Partnership (the "Debtor") filed a Chapter 11 bankruptcy proceeding in the U.S. Bankruptcy Court for the East-

ern District of Virginia. In November 1988, Dr. Suter filed a proof of claim in the bankruptcy case, which was prepared for him (although not signed) by his attorneys, Leo Scolforo and William Baker.

Main Street Management ("Main Street") also filed a claim, as a secured creditor of the Debtor by virtue of two perfected and recorded deeds of trust dated December 31, 1986. In a settlement reached in early December of 1988 and approved by the Bankruptcy Court, the Debtor acknowledged the validity of Main Street's secured claim. After the bankruptcy was converted to a Chapter 7 proceeding in June of 1989, the Bankruptcy Trustee, on behalf of the Debtor, entered into a second settlement with Main Street consenting to the validity of the deeds of trust. Respondent contends that both settlements were fraudulent, based on various theories, including conflict of interest and failure to give notice of the settlement to other creditors of the Debtor.

Respondent, who represented thirteen individual limited partners of the Debtor, filed an adversary proceeding on their behalf in December of 1989, to determine the validity and priority of liens. That proceeding was dismissed by the Bankruptcy Court in an order entered June 5, 1990, based on the lack of standing of the limited partners, and estoppel as to the validity of the notes accompanying the deeds of trust. Respondent filed a motion for reconsideration of the dismissal of the adversary proceeding and an appeal to the United States District Court for the Eastern District of Virginia. Both were unsuccessful.

---

law partner) and William Baker (another counsel to respondent's client).

**3.** In its report, the Board concluded that the Hearing Committee's finding that respondent

violated Rule 8.4(d) implied that he also violated its pre–1991 counterpart, DR 1–102(A)(5).

After the limited partners' action was dismissed in 1990, respondent, on reviewing the court file in the bankruptcy matter, discovered Dr. Suter's proof of claim against the Debtor. Respondent called Dr. Suter to inquire about representing him in the bankruptcy matter, and Dr. Suter referred respondent to one of his lawyers, William Baker. When contacted by respondent, Mr. Baker advised respondent that the decision was Dr. Suter's. Respondent maintains that from these two conversations he understood that he was retained by Dr. Suter to prosecute his claim in the bankruptcy proceeding on a contingency basis. Respondent did not meet with Dr. Suter, nor did he have a written retainer agreement with Dr. Suter. In fact, he did not speak to Dr. Suter again until 1992.

During the period between respondent's initial contact with Dr. Suter in 1990 and his formal withdrawal before the Bankruptcy Court from his representation in 1992, respondent filed numerous pleadings with the Bankruptcy Court as well as the District Court, purportedly on behalf of Dr. Suter.

In October 1990, respondent filed an adversary proceeding on behalf of Dr. Suter in the Bankruptcy Court, alleging that Main Street was not a secured creditor of the Debtor and that Dr. Suter had no notice of the deeds of trust Main Street claimed to hold at the time he paid his funds to the Debtor. Respondent did not send a copy of the pleading to Dr. Suter or to either of his attorneys (Messrs. Baker and Scolforo). Main Street moved to have the adversary proceeding dismissed, and sought sanctions against respondent and his client on the theory that Dr. Suter's adversary proceeding was duplicative of,

and precluded by, the proceeding brought on behalf of the limited partners that had been dismissed by the court. Eventually, the Bankruptcy Court dismissed both Dr. Suter's adversary proceeding, based on collateral estoppel, as well as the motion for reconsideration of the dismissal that respondent subsequently filed.

On January 29, 1991, respondent's partner sent a bill to Dr. Suter in the amount of $115.00 for charges for a process server and a filing fee. There was no charge for legal services. Dr. Suter did not respond to the bill. On March 7, 1991, respondent's partner sent a reminder letter to Dr. Suter about the outstanding bill. Dr. Suter responded that he did not know of any work done on his behalf and asked for information.[4]

On July 24, 1991, respondent filed a motion to dismiss the bankruptcy case for lack of jurisdiction on behalf of Suter PC, on the ground that the general partner of the Debtor had lost its status as a Virginia corporation in September 1981, and had not been reinstated. The Bankruptcy Court denied this motion, although there was no dispute that the fact that was alleged by respondent was correct. At the oral argument on the motion, Main Street moved again for sanctions. On November 13, 1991, the Bankruptcy Court awarded sanctions against Suter PC and respondent for filing pleadings for the improper purpose of causing unnecessary delay. Respondent filed a timely notice of appeal from the sanction award.

As of late 1991, respondent had not informed Dr. Suter of any of the above proceedings, nor of the sanction that had been imposed on his professional corporation. Dr. Suter became aware of them

4. Dr. Suter mailed the letter back after writing on it the following: "I was never made aware of anything that was done on my behalf. Please forward papers or documentation as to what was done and what was accomplished for me. Thank you."

only when the president of Main Street contacted Dr. Suter in late February of 1992, to ask why Dr. Suter had sued him. On February 26, 1992, Dr. Suter wrote respondent to "categorically stipulate that [respondent] do[es] not represent [him] or any of [his] business interests, including [his] professional corporation, in any matters at this time," and to remind respondent that he had refused to pay the invoice a year earlier. At Dr. Suter's request, his attorney, Mr. Scolforo, called H. Jason Gold, the attorney for Main Street, to request a copy of the record and other documents in the bankruptcy. Among the documents provided by Mr. Gold was a copy of a December 1991 letter from Main Street to respondent requesting "settlement discussions with Dr. Suter."

On March 4, 1992, still purporting to act on behalf of Dr. Suter, respondent filed with the District Court a brief in the appeal of the Bankruptcy Court's sanction award against Suter PC Respondent did not send a copy of the brief to Dr. Suter or his attorney.

On March 12, 1992, after having reviewed the records in the bankruptcy proceeding provided by Main Street's attorney (Mr. Gold), Mr. Scolforo, acting on behalf of Dr. Suter and his corporation, wrote to respondent, directing him to terminate immediately any and all legal action that he had taken in the name of Dr. Suter's corporation, including any appeals, and to obtain a *vacatur* of the sanction order entered November 13, 1991, insofar as it related to Suter PC Dr. Suter signed Mr. Scolforo's letter to reflect that he had seen and approved it.

On March 13, 1992, Main Street filed a motion to dismiss the appeal and to impose further sanctions, on the ground that "Mr. Thyden's maintenance of this adversary proceeding and the appeal from its dismissal have never been authorized by Dr.

Suter or the Corporation, Mr. Thyden's purported client." In its motion, Main Street alleged that respondent had signed pleadings in violation of Fed.R.Civ.P. 11 and Fed. R. Bankr.P. 9011.

In a letter dated March 23, 1992, to Dr. Suter, respondent referred to a telephone conversation between them "around" March 5, 1992, and to a second telephone conversation "just after" respondent's receipt of Mr. Scolforo's March 12, 1992, letter, when Dr. Suter had encouraged respondent to contact "Scolforo and work things out." In a letter also dated March 23, 1992, respondent advised Mr. Scolforo that he had been "retained by Dr. Suter in 1990 to recover $9,000 of his, on a one-third contingency," and referred to his conversation at that time with William Baker. Respondent also stated that he had not received an offer of settlement and "would not recommend to any client to settle the matter with Jessie Surles [president of Main Street]." Respondent informed Mr. Scolforo that he continued to represent Dr. Suter, indicating that Dr. Suter probably would have to testify on April 3, 1992, at the hearing on the motion to dismiss the appeal.

In a letter dated March 25, 1992, Mr. Scolforo, on behalf of Dr. Suter, directed respondent to "cease all legal action brought on behalf of [Dr. Suter's] professional corporation and to have the sanctions Order set aside as to Richard P. Suter, D.D.S., P.C." It also stated that "Dr. Suter denies retaining you in 1990 or at any other time"; and reiterated that "Dr. Suter does not want to be involved in any litigation involving the Fauquier Airport." Respondent, however, took no action on Dr. Suter's behalf to seek relief from the November 1991 sanctions order entered against Suter PC. Instead, on March 26, 1992, respondent filed a response to Main Street's motion to dismiss

the appeal and for sanctions, "tak[ing] issue with the statements ... that Dr. Suter never knew or authorized" respondent's efforts on his behalf.

On March 30, 1992, Mr. Scolforo wrote yet another letter to respondent, asking that respondent "not communicate directly with Dr. Suter but communicate with him in writing only through this [Mr. Scolforo's] office."

From the time that respondent filed the adversary action in Dr. Suter's name in October 1990, to late February or early March 1992, he provided no information either orally or in writing to Dr. Suter or to his attorneys concerning the progress of the adversary action.

On April 3, 1992, the District Court held a hearing on Main Street's motion to dismiss Dr. Suter's appeal from the Bankruptcy Court's order of dismissal and sanction. Upon advice of counsel, respondent moved to withdraw as counsel to Dr. Suter. The District Court dismissed the appeal and remanded the matter to the Bankruptcy Court for consideration of Main Street's motion for sanctions against respondent.

In September 1992, upon consideration of a motion to amend filed by Main Street, the Bankruptcy Court amended its previous sanction order, relieving Suter PC of any liability and imposing the sanction solely against respondent. On November 20, 1992, the Bankruptcy Court held a hearing to determine, among other things, whether respondent should be subject to further sanctions, as requested by Main Street. The Bankruptcy Court heard testimony from, among others, Dr. Suter. It imposed additional sanctions on respondent of $17,794.50, attorney's fees, costs and expenses incurred by Main Street, together with interest at the legal rate.

## II.

### Analysis

Upon receipt of a Report and Recommendation from the Board on Professional Responsibility, we "accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record, and shall adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or otherwise would be unwarranted." D.C. Bar R. XI, § 9(g) (1998); *see In re Slosberg,* 650 A.2d 1329, 1330 (D.C.1994) (citation omitted); *see also In re Colson,* 412 A.2d 1160, 1164 (D.C.1979).

■ Notwithstanding that bar discipline does not result in criminal conviction, it is well-settled that an attorney who is the subject of such proceedings is entitled to procedural due process safeguards. *See In re Thorup,* 432 A.2d 1221, 1225 (D.C. 1981). The procedural requirements which apply in attorney disciplinary proceedings are analogous to those of other "contested cases." *Id.* The burden of proving the charges rests with Bar Counsel and factual findings must be supported by clear and convincing evidence. *See id.*

Respondent's principal claim is that the Board erred in failing to impose reciprocal discipline and that the delay in adjudication of this matter requires dismissal of the charges, or, at a minimum, no suspension of his license for practice. He also contends that there were procedural irregularities that contravened the rules and caused him prejudice: the substitution of a hearing committee member on the day of the hearing, the hearing committee's review of the exhibits before his evidentiary objections were resolved, and the requirement that he present evidence of mitigation before he knew the violations to which mitigation should be addressed. He also

claims that some of the Board's findings of fact were erroneous. We consider—and reject—each assertion in turn.

## A. Reciprocal Discipline

■ Respondent renews his argument that this matter should be treated as a case of reciprocal discipline, with the identical disposition reached by the Bar of the Commonwealth of Virginia: dismissal of the charges with a requirement that he complete six hours of continuing legal education in the area of ethics,[5] without any period of suspension. In contrast, the Board has recommended that respondent be suspended for thirty days. We impose the "identical sanction" ordered by a "disciplining court" outside the District of Columbia, unless one of five factors is shown, by clear and convincing evidence.[6] D.C. Bar R. XI, § 11(c).

■ As noted earlier, respondent's motion requesting imposition of reciprocal discipline was denied by a motions division of this court in 1999. In its opposition to the motion filed with the court, Bar Counsel argued that the dismissal of charges with terms in Virginia did not constitute "discipline" within the meaning of Rule XI, § 11, but was akin to a consensual diversion agreement under Rule XI, § 8.1. Respondent countered that a dismissal with terms constitutes discipline in Virginia because it occurs only after a subcommittee has found misconduct and compliance with the terms imposed are monitored. Our review of the "Subcommittee Determination" of the Virginia State Bar confirms that there has been a finding of misconduct.[7] In its present brief to this court, Bar Counsel adds another rationale, that once it has investigated, decided to prosecute, and recommended sanction appropriate to our standards, the court should not ignore this jurisdiction's proceedings because Rule XI, § 11(c) does not "requir[e] us to permit foreign discipline to trump the results of an exhaustive original disciplinary proceeding here." *In re Perrin,* 663 A.2d 517, 523 (D.C.1995). We agree that our disciplinary system's findings and recommendations—undertaken after the court denied respondent's request to impose reciprocal discipline—should not be set aside without good cause. There is no reason to do so here because we are not

---

5. The Virginia Bar also required that respondent comply with the mandatory continuing legal education hours required to maintain his license to practice law in the Commonwealth of Virginia. There is no comparable requirement in the District of Columbia.

6. Under the Rule the five factors to be considered are:

(1) The procedure elsewhere was so lacking in notice or opportunity to be heard as to constitute a deprivation of due process; or
(2) There was such infirmity of proof establishing the misconduct as to give rise to the clear conviction that the Court could not, consistent with its duty, accept as final the conclusion on that subject; or
(3) The imposition of the same discipline by the Court would result in grave injustice; or

(4) The misconduct established warrants substantially different discipline in the District of Columbia; or
(5) The misconduct elsewhere does not constitute misconduct in the District of Columbia.
D.C. Bar R. XI, § 11(c).

7. After making a finding of misconduct, the Subcommittee Determination states that it has decided "to offer the Respondent an opportunity to comply with certain terms and conditions, compliance with which by June 15, 1998 shall be a predicate for the disposition of this complaint by imposition of a Dismissal with Terms.... Upon satisfactory proof that the above noted terms and conditions have been met, a Dismissal with Terms shall then be imposed, and this matter shall be closed. If, however, the terms and conditions have not been met by June 15, 1998, a Private Reprimand shall be imposed."

bound to follow the same disposition as Virginia in this case, even if we were to consider that the dismissal in Virginia constituted discipline. The Board's findings of misconduct went beyond the findings in Virginia that respondent failed to keep his client advised, and included a finding that respondent unduly burdened the administration of justice. The Hearing Committee and the Board determined that the respondent's sustained pattern of misconduct warranted suspension to be consistent with sanctions in this jurisdiction for comparable conduct. As we discuss *infra*, we agree. A period of suspension is self-evidently "substantially different" from a dismissal of the charges with terms. As "this court can impose a greater sanction than that imposed in the other jurisdiction," *In re Dietz*, 653 A.2d 854, 855 (D.C. 1995) (citation omitted), and D.C. Bar Rule XI, § 11(c)(4) "provides for an exception to the imposition of reciprocal discipline where Bar Counsel ... clearly demonstrates that 'the misconduct established [in the proceeding in the other jurisdiction] warrants substantially different discipline in the District of Columbia,'" *In re Garner*, 576 A.2d 1356, 1357 (D.C.1990), we are not bound to impose the identical sanction. We therefore see no reason to diverge from our previous ruling denying respondent's request that we follow the disposition reached in Virginia.

## B. Delay

■ Respondent contends that the charges should also be dismissed because the Hearing Committee failed to submit its report within sixty days of the conclusion of the hearing as required by D.C. Bar R. XI, § 9(a),[8] and that the Board, also, failed to issue its report "promptly," as required by D.C. Bar R. XI, § 9(d).[9] Instead, the Hearing Committee's report issued on April 13, 2001, more than a year after the hearing held on January 27, 1999;[10] the Board's report was issued on February 7, 2002.[11]

■ "Nothing in the text of the rules ... specifies the result of a Hearing Committee's failure to adhere to the time limit, so we presume that the rule is directory, rather than mandatory." *In re Morrell*, 684 A.2d 361, 370 (D.C.1996); *see also In re Carlson*, 802 A.2d 341, 351 (D.C.2002). We recognize, however, that respondent additionally claims that he has been prejudiced by the Board's delay; and we also are cognizant of the further delay before this court. Although this case has taken an unusually long time to reach final resolution, "mere delay in the disciplinary process generally does not provide a legitimate ground for dismissal of the complaint." *In re Morrell*, 684 A.2d at 368, 370. To obtain relief from the charges, prejudice resulting from the delay must be shown. *See id.* at 368. Respondent argues, for the first time before this court, that he has been prejudiced by not being able to call a witness, William Baker, who was unable to testify at the Hearing Committee due to delay.

---

8. D.C. Bar R. XI, § 9(a) provides: "[w]ithin sixty days after the conclusion of its hearing, the Hearing Committee shall in every case submit to the Board a report containing its findings and recommendation."

9. D.C. Bar R. XI, § 9(d) provides: "the Board shall promptly prepare a report containing its findings and recommendation."

10. Post-hearing briefing was completed on May 12, 1999, more than sixty days after the hearing, with respondent's consent.

11. Respondent's brief to the Board was filed on June 22, 2000. After Bar Counsel filed her brief on July 14, 2000, oral argument was scheduled for October 5, 2000. Respondent did not appear on that day, and no oral argument was had.

He also generally asserts that his application to practice before the Maryland Bar, where his firm's principal office has subsequently been located, was delayed because of the pendency of this matter, and that he has been prejudiced in his handling of client matters by the prospect of a possible suspension in the District of Columbia.

■ Although respondent now claims that he was prejudiced by not being able to call William Baker because he could not recollect the facts at issue by the time of the hearing in January of 1999, respondent never raised before the Hearing Committee or the Board that he was prejudiced by Mr. Baker's unavailability. As noted, the D.C. disciplinary proceeding was deferred—at respondent's request—pending resolution of the charges in Virginia, and was promptly reinstated in the fall of 1998, upon the disposition in Virginia. At that time, respondent agreed that Mr. Baker did not need to appear and that his correspondence with Bar Counsel could serve as his testimony.[12] His testimony, moreover, would have related primarily to a charge of which respondent was exonerated—that he dishonestly purported to represent Dr. Suter. With respect to post-hearing delay, respondent has been free to practice law during the prosecution of the claims against him. *See In re Morrell,* 684 A.2d at 370. Where `respondent's ability to present a defense has not been impaired,

and in the absence of other specific prejudice, the serious nature of the violations requires that the public interest in regulating members of the bar take precedence over the attorney's preference—no matter how understandable—to be relieved of the burden of anxiety and uncertainty inherent in every disciplinary proceeding. *See In re Williams,* 513 A.2d 793, 796–97 (D.C. 1986) (per curiam).

## C. Procedural Challenges

■ Respondent raises several procedural challenges to the Hearing Committee's procedures, none of which was raised before the Board, or resulted in substantial prejudice. He is therefore procedurally barred from raising these claims now. *See In re Bernstein,* 707 A.2d 371, 375 n. 5 (D.C.1998); *In re James,* 452 A.2d 163, 168 (D.C.1982).

### 1. Substitution of a Hearing Committee Member

■ Respondent argues that he was denied due process, as provided under Board Rule 7.20,[13] when one of the committee members was replaced just before commencement of the hearing, depriving him of any ability to make reasonable inquiry about, or challenge, the new member. We perceive no violation of the Rule or of due process protections as respondent was not precluded from challenging the new committee member. Respondent did not ob-

---

12. Before the Hearing Committee, respondent's counsel stated:

> With regard to Mr. Baker, he's written two very detailed letters to the Bar, and they've offered just to put them [in the record]. I spoke to Mr. Baker, and he doesn't even remember what's in those letters. So, I'll be happy to do that [stipulate] if the Bar wants to do that to resolve that problem.

13. D.C. Board Rule 7.20 (1995) provides:

> The identity of the Hearing Committee members shall be included in the notice of

hearing provided to respondent and Bar Counsel. Any challenges to the members of the Hearing Committee must be made by affidavit alleging a personal bias or prejudice on the part of the Hearing Committee member against the party submitting the affidavit .... A Hearing Committee member appointed *pro hac vice* within seven calendar days of the hearing to replace a previously named member may be challenged without regard to the seven day notice ordinarily required.

ject to the new committee member's participation when it was announced or at any time during the hearing, nor did he raise it before the Board. To the contrary, respondent led the Committee Chair to believe that he did not object to the new committee member [14] and he does not now contend that he was, in fact, prejudiced by the replacement of a committee member.

## 2. The Hearing Committee's Review of the Exhibits

■ Respondent argues that he was prejudiced because, before the Chair ruled on his evidentiary objections, the Hearing Committee had already read and reviewed all the exhibits. Respondent also claims that the Committee Chair never ruled on the vast majority of the objections, and that, instead, such rulings were made by the Board in its Report, three years after the Hearing Committee had already considered the evidence. Although respondent did not raise this issue with the Board, in its Report the Board noted that the Hearing Committee had not ruled on the respondent's objections,[15] excluding some of Bar Counsel's exhibits and admitting others.[16] Although respondent now

argues that the Hearing Committee's review of Bar Counsel's exhibits, which he contends contained hearsay, biased the members against him, the Hearing Committee eschewed reliance on all but one of the exhibits to which respondent had objected. There is no suggestion that the Board, which found that the Hearing Committee's findings were supported by the evidence, improperly relied on the excluded exhibits, nor does respondent take issue with any of the Board's specific evidentiary rulings. Given that respondent admitted that he did not keep his client informed, the only contested issue was whether his conduct before the Bankruptcy Court and District Court interfered with the administration of justice. Evidence concerning these filings was contained in respondent's testimony, and the record and orders from those courts which were admitted into evidence. Respondent does not contend that the Board took into account any filings or court order that did not, in fact, exist. Under the circumstances, we perceive no abuse of discretion in either the Hearing Committee's or the Board's handling of respondent's evidentiary objections. *See In re Thompson,* 583 A.2d 1006, 1007 (D.C.

14. The new committee member was Ms. Barbara Fox. She disclosed that "in January of 1995, a memo was written to [her] husband who was Chair [of the Board] at the time, ... regarding Mr. Thyden and his request for adjudication to be deferred until the situation was resolved in Virginia." Respondent's counsel stated that Ms. Fox's disclosure "causes him no problem."

15. The Board recognized that the Hearing Committee had decided that one contested exhibit (BX F–10) was admissible, and that all other challenges were moot because it did not rely on them in making its findings. The exhibit that was admitted over respondent's objection was a letter dated March 30, 1992, from Mr. Scolforo to respondent directing that respondent cease communicating directly with Dr. Suter and to end the litigation and have the sanctions against Suter PC removed.

16. The Board admitted the following exhibits, in addition to the one admitted by the Hearing Committee (BX F–10): BX D–4 (the letter of complaint to Bar Counsel filed by Jason Gold that initiated the investigation in D.C.); BX E–1 (computerized docket sheet of the bankruptcy proceeding from the U.S. Bankruptcy Court for the Eastern District of Virginia); BX E–2 (computerized docket sheet of the adversary proceeding filed by respondent on behalf of Dr. Suter in the Bankruptcy Court); BX E–18 (briefs filed in the appeal to U.S. District Court of the Bankruptcy Court's dismissal of the complaint filed by respondent on behalf of the Debtor's limited partners); and BX E–27(b) (order dated August 6, 1991 of the Bankruptcy Court denying the motion filed by respondent on behalf of Dr. Suter to dismiss the Debtor's bankruptcy petition).

1990) (noting that "strict rules of evidence do not control professional responsibility hearing").

### 3. Mitigation Evidence

■ Respondent argues to the court— he did not raise this with the Board—that the Hearing Committee violated Board Rule 11.9 (1995) by requiring him to present mitigation evidence after making a preliminary determination that he had violated Rule 1.4 by failing to keep his client informed. He contends that he was deprived of the opportunity to offer evidence in mitigation of the violation of Rule 8.4(c) (serious interference with the administration of justice) that the Hearing Committee subsequently found when it issued its report, and that the recommendation of a thirty-day suspension was based, in part, on the absence of mitigation.

Respondent filed a post-hearing submission addressing mitigation, which expressly recognized that he had been offered a hearing on the issue, but stated that he "saw no reason to burden the panel with further convincing on this one issue." Before this court, he has not proffered any additional evidence of mitigation he would have presented to the Hearing Committee had he known earlier of the additional violation that the Hearing Committee ultimately found. In view of respondent's failure to raise the issue before the Board and the apparent lack of prejudice, we do not think that the procedure followed by the Hearing Committee should affect our consideration of the Board's recommendation.

### D. Evidentiary Support for the Board's Findings

Appellant challenges the Board's finding that his handling of matters before the Bankruptcy Court were improper and resulted in burdening the administration of justice. Instead, he contends, his actions were no more than zealous advocacy on behalf of his clients. He also contends that the Board incorrectly found that he failed to communicate a settlement offer to his client.

The Board found that respondent improperly burdened the administration of justice in violation of DR 1–102(A)(5)[17] and Rule 8.4(d) when he moved to dismiss the underlying bankruptcy petition and filed an adversary proceeding on behalf of the limited partners, and appealed the denials of both (with sanctions imposed in connection with the dismissal motion), even though he acknowledged that the limited partners lacked standing. The Board also found that respondent's filing of a subsequent adversary proceeding making essentially the same claims, this time purportedly on behalf of Dr. Suter even though it was continued for a month after he had been "categorically fired by his client," similarly burdened and delayed the underlying bankruptcy petition. The Hearing Committee found, and the Board agreed, that when respondent pursued this adversary proceeding nominally in the name of

---

**17.** Respondent asserts that Bar Counsel had said she did not intend to charge him with respect to his filing of the adverse action on behalf of the limited partners which formed the basis of the violation of DR 1 –102(A)(5) and that, consistent with that understanding, the Hearing Committee did not find such a violation. The Board, however, may make additional findings if they are supported by clear and convincing evidence in the record. The Specification of Charges included reference to DR 1–102(A)(5) for acts before 1991, as well as of the facts occurring before that date that underlie the violation of the Rule found by the Board. The Board's finding, moreover, is of a piece with the finding that respondent violated Rule 8.4(d) in later filings and had no impact on the recommended sanction.

Dr. Suter, he was "motivated by an external goal to the representation in the service of which he was putatively acting," namely, primarily for the benefit of the limited partners and respondent's own benefit in receiving a sizable fee from them if he succeeded in dislodging the settlement that had been reached in the bankruptcy proceeding with the claimant that respondent argued should not be superior to his clients, who were unsecured creditors.

■ Respondent's challenge is not to any particular fact found by the Board concerning what respondent did in the various proceedings, but to its interpretation of his actions as substantively frivolous and interposed for the purpose of delay in order to strengthen his hand in negotiations on behalf of the limited partners. We conclude that there is evidence in the record from which the Board could find, by the clear and convincing standard, that respondent's actions crossed the line between zealous advocacy and those that are impermissible because they unduly burden the courts. First, there is the evidence—undisputed by respondent—that the Bankruptcy Court twice sanctioned respondent personally as a result of his filings in that court. We do not look behind the Bankruptcy Court's determination, which was sustained by the District Court. There is also respondent's acknowledgment that the limited partners did not have standing to file the adversary action that the court dismissed, which belies that the actions taken in their name were within the bounds of zealous advocacy. Moreover, respondent's continuation of the adverse action filed in Dr. Suter's name even after his purported client categorically told him to stop, also supports that respondent was

using the bankruptcy proceeding to further his own interests as well as those of other clients. The fact that other clients might benefit, does not excuse litigation that is unjustified on its own.

■ Although respondent has candidly admitted throughout the proceeding that he did not keep Mr. Suter informed about any of the many filings made in his name, respondent challenges the Board's finding that he violated Rule 1.4(c) (failure to promptly inform client of an "offer of settlement"). Respondent does not dispute that he received a letter from Main Street's lawyer in December 1991 "requesting settlement discussions with Dr. Suter" or that he did not inform Dr. Suter of the request. Rather, he contends that the letter was not a good faith offer *of* settlement, but rather an attempt by an adversary to drive a wedge between respondent and his client.[18] Whether or not respondent was correct in or reasonably believed his interpretation of what motivated the offer, he cannot keep the fact of the communication from his client, who might come to a different interpretation and wish to pursue the negotiation. *See In re Bernstein*, 707 A.2d at 377. Respondent's reading of what Rule 1.4(c) requires is too narrow to protect the interests of the client, particularly in a case such as this, where respondent's own interests as well as those of his other clients, were at odds with those of the client to whom the settlement approach was made—as is made clear by the fact that, once Dr. Suter's attorney, Mr. Baker, was in direct communication with Main Street's attorney, the litigation was promptly dismissed. In light of the undisputed facts in this case, we conclude there was clear and

18. We note that in the Virginia proceeding respondent admitted that he violated Virginia Rule 6–101(c), which requires a lawyer to

"inform his client of ... communications from another party that may significantly affect settlement or resolution of the matter."

convincing evidence that respondent violated Rule 1.4(c).

## E. Sanction

██ A number of factors are used to determine the appropriate sanction, including: (1) the seriousness of the conduct at issue; (2) the prejudice, if any, to the client which resulted from the conduct; (3) whether the conduct involved dishonesty and/or misrepresentation; (4) the presence or absence of violations of other provisions of the disciplinary rules (5) whether the attorney had a previous disciplinary history; (6) whether or not the attorney acknowledged his or her wrongful conduct; and (7) circumstances in mitigation of the misconduct. *See In re Jackson,* 650 A.2d 675, 678–79 (D.C.1994) (per curiam); *In re Hill,* 619 A.2d 936, 939 (D.C.1993) (per curiam). "The imposition of sanctions in bar discipline, as with criminal punishment, is not an exact science but may depend on the facts and circumstances of each particular proceeding." *In re Fair,* 780 A.2d 1106, 1115 n. 24 (D.C.2001) (citation omitted).

██ We "adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or otherwise would be unwarranted." *In re Slattery,* 767 A.2d 203, 212 (D.C.2001) (quoting R. XI, § 9(g)). In measuring consistency between cases, it is necessary to compare the "gravity and frequency of the misconduct, any prior discipline, and any mitigating factors such as cooperation with Bar Counsel, remorse, illness or stress." *In re Steele,* 630 A.2d 196, 199 (D.C.1993). We are cognizant that comparing one case to another is an inherently imprecise process, and the Board's expertise in disciplinary matters is entitled to considerable deference. *See In re Haupt,* 422 A.2d 768, 771 (D.C.1980) (per curiam).

██ We agree with the Board that respondent's misconduct is serious. Respondent did not communicate with Dr. Suter concerning the substance of the proceedings during the entire representation, including failing to convey an offer to settle the case. He placed his client at risk by allowing monetary sanctions to be entered against the client's corporation by the Bankruptcy Court. As the Board found, respondent's actions—though nominally on behalf of Dr. Suter—were taken to advance the interests of other clients and seriously interfered with the administration of justice in the Bankruptcy Court and the United States District Court, for which he was personally sanctioned on two occasions. Importantly, respondent has yet to appreciate the seriousness of his misconduct, as he only acknowledges a violation of Rule 1.4(a) for failing to keep his client informed, and continues to dispute all other violations, including that he did not convey an offer to settle, notwithstanding his having conceded violating a similar rule in Virginia and the undisputed documentary record in the case. At bottom, he insists that his conduct should not be sanctioned because his actions benefited his clients and his position before the Bankruptcy Court—though rejected by that court—was correct on the merits.

Past cases involving client neglect have resulted in a range of sanctions, from public censure to a period of suspension of thirty days or longer. *See In re Wright,* 702 A.2d 1251 (D.C.1997) (per curiam) (thirty-day suspension with a showing of fitness for failure to communicate with client, conduct which seriously interferes with justice, and several other violations); *In re Bernstein,* 707 A.2d at 371 (thirty-day suspension for failure to keep client reasonably informed, failure to represent client zealously, and failure to act with reasonable promptness in representing

client). A recommendation of the Board with respect to a proposed sanction comes to this court with a strong presumption in favor of its imposition. *See In re Goffe*, 641 A.2d 458, 463–64 (D.C.1994) (per curiam) ("Generally speaking, if the Board's recommended sanction falls within a wide range of acceptable outcomes, it will be adopted and imposed."). Respondent argues that the usual deference is not due in this case because the Board noted there were "no mitigating circumstances," ignoring that the delay in the proceedings should mitigate the sanction. Concerning delay, we have determined that the circumstances of the individual case must be "sufficiently unique and compelling to justify lessening what would otherwise be the sanction necessary to protect the public interest." *In re Fowler*, 642 A.2d 1327, 1331 (D.C.1994). At the time the Board issued its Report in early 2002, the proceeding had been under active prosecution for approximately three and a half years, from the time the specification was filed in the fall of 1998 (after it had been deferred since 1992 at respondent's request). We do not think that period of time, without more, is enough to undermine the Board's recommended sanction for the type of misconduct in this case. Nor do we think that the additional delay before this court, though regrettable, compels mitigation of the sanction warranted by the misconduct, in a case where respondent has not presented any meritorious argument challenging the substance of the proceedings, nor been prejudiced by the delay. To be meaningful, mitigation of a thirty-day suspension would have to result in no suspension at all. To do so in this case would elevate the concern with efficiency over the public interest.

Accordingly, it is

ORDERED that respondent be suspended from the practice of law for thirty days, effective thirty days from the date of this opinion. *See* D.C. Bar R. XI, § 14(f).

*So ordered.*